**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CST INDUSTRIES HOLDINGS INC., *et al.*,[1] | Case No. 17-11292 (___) |
| Debtors. | Joint Administration Pending |

**DECLARATION OF TIMOTHY J. CARPENTER,**
**CHIEF EXECUTIVE OFFICER OF CST INDUSTRIES, INC.,**
**IN SUPPORT OF FIRST DAY RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Timothy J. Carpenter, for this Declaration under penalty of perjury, state as follows:

1.     I am Chief Executive Officer of CST Industries, Inc. ("CST Industries") and of CST Industries Holdings Inc. ("CST Holdings"), each of which is a corporation organized under the laws of the State of Delaware and one of the debtors and debtors-in-possession in the above-captioned cases together with CST Power & Construction, Inc. ("CST Power"), which is a California corporation wholly owned by CST Industries (collectively, "CST" or the "Debtors"). I have served as Chief Executive Officer of CST Industries and CST Holdings since September 1, 2014. In this capacity, I am generally familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records.

2.     I submit this declaration (the "Declaration") on behalf of the Debtors in conjunction with their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on the date hereof (the "Petition Date"), commencing the above-

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: CST Industries Holdings Inc. (4872), CST Industries, Inc. (9554), CST Power & Construction, Inc. (9480). The Debtors' headquarters are located at: 903 E. 104th Street, Suite 900, Kansas City, Missouri 64131.

captioned chapter 11 cases (the "Chapter 11 Cases"), and in support of the various types of relief requested in certain applications and "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions").  I am authorized to submit this Declaration on behalf of the Debtors.

3.      I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in preserving and maximizing the value of the Debtors' assets, and enabling the Debtors to propose and confirm a plan of reorganization; and (iii) is in the best interests of the Debtors, their estates and creditors.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of the Debtors' books and records, on information prepared or collected and supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, my discussions with other members of the Debtors' management team, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs.  In making statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.

5.      I am over the age of 18 and am competent to testify.

6.      If I were called upon to testify, I could and would testify competently to the facts set forth herein.

7.     Part I of this Declaration provides an overview of the Debtors' business operations and describes the Debtors' corporate history and prepetition capital and debt structure and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.

## Part I – Background and Restructuring Strategy

### A.     Overview of the Debtors

#### i.     The Debtor Entities

8.     CST Industries and CST Holdings are Delaware corporations that maintain a principal place of business in Kansas City, Missouri.  CST Power is a California corporation that maintains a principal place of business in Gardena, California.

9.     CST Industries is the Debtors' main operating entity.  CST Holdings operates solely as a holding company.  CST Power performs specialty jobs requiring union labor.

#### ii.     CST's Operations

10.     CST is the leading global manufacturer of factory coated bolted steel storage tanks, aluminum geodesic domes, and specialty covers.  CST's products are used by customers to store and cover a wide array of products, including, among others, architectural and agricultural products, water, dry bulk, oil and gas.  CST also builds covers for a variety of specialty segments, ranging from sports stadium domes to the famous Epcot Center ball.

11.     CST is a widely recognized brand and has a reputation throughout the industry for its ability to provide highly-engineered, customized solutions and industry-leading technologies with consistent safety and quality.  CST is a differentiated provider in the industry with the capability to combine innovative storage systems, complementary or independent cover products, proprietary coatings services, field installation, inspection and maintenance expertise,

3

and retrofit proficiency under a single umbrella.  CST's global operations (including non-debtor affiliates) serve more than ten end markets across a diverse global footprint, which includes six manufacturing facilities and nine international sites.  CST's installed base of more than 350,000 tanks and covers across 125 countries is the largest in the industry.

12.    CST Industries sells its products in all 50 states, including Delaware, as well as in the District of Columbia.  Outside the United States, CST sells its products through sales representatives and/or offices located in Argentina, Brazil, Portugal, Singapore, South Africa, and Vietnam.  CST Industries generally sells its products to customers through its sales representatives, some of whom are independent sales representatives, as well as through third party dealerships pursuant to contractual arrangements.

13.    As a result of the high quality of products sold and CST's positive reputation in the market, CST generates exceptional free cash flow with an average historical free cash flow conversion rate greater than 95% and capital expenditures that average less than 2% of revenue.  Based on ongoing initiatives and as a result of these Chapter 11 Cases, CST expects to achieve substantial revenue and EBITDA growth over the next several years.

14.    CST has two main product lines:  (i) storage tanks, with respect to which CST Industries does business as "CST Storage"; and (ii) domes, with respect to which CST Industries does business as "CST Covers".  CST Storage's products include glass fused steel tanks, liquid and dry epoxy storage tanks, galvanized storage tanks, construction and services, agriculture parts & unloaders, and factory welded storage tanks.  CST Covers' products include geodesic domes, flat panel covers, custom aluminum vaults for liquid and bulk storage applications, and architectural domes tailored to customers' project specifications, including among others, sports stadium domes, condo canopies, and botanical atriums.  All of CST's products are project based

4

and thus engineered to order such that CST's inventory on hand consists mainly of raw materials and work in process rather than finished goods.

15.   Of CST's five manufacturing facilities, three manufacture storage products, with each specifying in a particular storage product, and one has the capability to manufacture covers products.  Following the closure of the fifth manufacturing facility, in Rincon, Georgia, which manufactured covers products, the Conroe, Texas facility now manufactures all of CST's covers products.

16.   Other than CST's factory welded tanks, which are large structures that are fully manufactured at CST's manufacturing facility and then transported as whole on specialized "wide load" trucks, all of CST's other products (including all covers products) are manufactured in component parts at CST's manufacturing facilities and are then assembled and installed onsite.

17.   CST products are generally sold in three ways:   (i) by CST employees/sales representatives; (ii) by brokers/independent sales representatives; and (iii) through dealerships pursuant to contractual relationships.  CST's dealerships are primarily dealers for its North American and Caribbean domestic water, wastewater and agricultural products that have the exclusive right to sell CST products within an assigned territory.

18.   CST's products are generally transported by various means, all of which are handled by third parties.  CST does not maintain any warehouses; rather, dealers, third party freight carriers, or in certain circumstances, customers, pick up CST's products directly from its manufacturing facilities and transport the product to the end destination.  Third party freight carriers generally use flatbed trucks to transport CST's products, although the carriers use specially designed "wide load" trucks for CST's fully assembled products.

19.   CST's products are generally installed in four ways:  (i) by CST's employees; (ii) by third party contractors; (iii) by CST's dealerships, which are contractual relationships governed by dealership agreements; and (iv) by customers who choose to self-install.

### iii.   Employees

20.   CST Industries presently has approximately 482 employees.  CST Industries' DeKalb, Illinois facility is unionized, with employees there being members of the Teamsters union.  All of CST Industries' other plants are non-union.

21.   CST Industries also maintains a representative sales office in Ho Chi Minh City, Vietnam, which employs less than 10 individuals at a time.  These individuals are CST Industries employees and sell products on behalf of CST Industries.  They are paid by CST Industries.  The proceeds of sales brokered by these employees are property of CST Industries.

22.   CST Power has approximately 10 employees, all but one of which are union employees.

23.   CST Holdings does not have any employees.

### iv.   Office and Manufacturing Locations

24.   Within the United States, CST Industries owns five manufacturing facilities.  The facilities are located in (i) DeKalb, Illinois; (ii) Parsons, Kansas; (iii) Conroe Texas; (iv) Winchester, Tennessee; and (v) Rincon, Georgia.  Each of these properties is subject to a mortgage in favor of the Prepetition Agent (defined below), which mortgages are solely in place to collateralize the Debtors' obligations under the BNP Loan Agreement (defined below); the Debtors do not independently owe any loan amounts with respect to those facilities.  Within the last several months, the Debtors shut down their operations at the Rincon facility and terminated

6

all employees there.  In May 2017, the Debtors listed the Rincon facility for sale for $3.5 million and the property is presently actively being marketed.

25.    The Debtors also lease properties in the following four locations: (i) & (ii) Gardena, California (one lease for CST Industries and one for CST Power), (iii) Winchester, Tennessee (CST Industries), and (iv) CST's headquarters located in Kansas City, Missouri (CST Industries).  CST Industries is also a co-signor on a dealership lease in Minnesota.

**v.    Non-Debtor Affiliates**

26.    The Debtors have non-Debtor affiliates in the United Kingdom (CST Industries (UK) Limited) ("CST UK") and Singapore (CST Industries Singapore Pte Ltd.) ("CST Singapore" and together with CST UK, the "Non-Debtor Entities").

27.    CST UK manufactures a particular type of galvanized tanks.  It is 100% owned by CST Industries.  CST UK also sometimes sells products on behalf of CST Industries.  CST UK also maintains a branch office in Dubai, United Arab Emirates where it conducts sales for the Middle East.  Traditionally, CST UK generates positive cash flow for CST Industries.  However, due to cash flow needs, CST UK typically requires intercompany loans from CST Industries every several months, which it then repays to CST Industries as soon as practicable.

28.    CST Singapore is a sales office for CST Industries and is 100% owned by CST Industries.  I understand that CST Singapore's existence is necessitated by the fact that Singapore law requires a company to maintain a legally domiciled entity in Singapore in order to do business there.  CST Singapore has one employee and requires funding from CST Industries totaling approximately $25,000 per month to pay such employee's salary, commissions and expenses.  CST Singapore does not generate positive cash flow; rather, it books contracts on behalf of CST Industries in the U.S.

29.    CST Power is also a member of two joint ventures—one in Japan (Temcor Dome Japan Co. Ltd.), in which CST Power holds a 20% ownership interest, and one in India (Temcor Rollwell), in which CST Power holds a 49% interest.  Temcor Dome Japan Co. Ltd. buys and resells CST products in Japan.  Temcor Rollwell sells CST products in India.

### vi.    Ownership Information

30.    CST Holdings is a privately held corporation that is majority-owned by funds affiliated with The Sterling Group, a Houston, Texas-based private equity firm which owns approximately 60% of CST Holdings' stock.  The Sterling Group has held a majority of CST Holdings' stock since 2006.  A list of all equity holders of CST Holdings is being filed simultaneously with the Debtors' other first day filings.

31.    CST Industries is privately held and is 100% owned by CST Holdings.

32.    CST Power is privately held and is 100% owned by CST Industries.

33.    Below is an organizational chart depicting the relationships among the Debtors and certain of their affiliated entities[2]:

---

[2]    Other than CST Holdings, CST Industries and CST Power, the entities listed in the organizational chart have not filed for chapter 11 bankruptcy relief.

8

**CST Industries Corporate Organizational Structure**



IMPAC 5242609v.1

B.        **Summary of Prepetition Indebtedness**

34.      As of the Petition Date, the Debtors owed approximately $171.8 million on account of debt financing, approximately $57.5 million of which is senior secured debt owed under the BNP Loan Agreement (defined below) and approximately $114.3 million of which is unsecured mezzanine debt owed under the A&R Mezzanine Purchase Agreement (defined below).  The following is a brief summary of the history and present status of the Debtors' prepetition debt obligations.

(i)        **The BNP Credit Facility Senior Secured Obligations**

35.      CST Industries entered into a Credit Agreement, dated as of May 23, 2012 (as amended, amended & restated or otherwise modified, the "BNP Loan Agreement"), under which BNP Paribas (the "Prepetition Agent") served as administrative agent for the lenders (the "Prepetition Secured Lenders").  The BNP Loan Agreement established a term loan facility providing an aggregate commitment of $85,000,000 and a revolving loan facility of up to $25,000,000 (collectively, the "BNP Credit Facility").  The BNP Credit Facility refinanced a prior credit facility among CST Industries, BNP Paribas as administrative agent, and certain lenders.  Contemporaneously with the execution of the BNP Loan Agreement, the Prepetition Agent and CST Holdings entered into an agreement pursuant to which CST Holdings and CST Power provided a guaranty of CST Industries' obligations under the BNP Loan Agreement (as amended, amended & restated or otherwise modified, the "Guaranty Agreement").  The BNP Loan Agreement's terms provide for maturation on May 23, 2017.

36.      CST Industries also entered into a security agreement, dated as of May 23, 2012 (as amended, amended & restated or otherwise modified, the "Security Agreement"), pursuant to which it granted BNP Paribas, as administrative agent and representative of the Prepetition

10

Lenders, a security interest in substantially all of CST Industries' personal property (with certain exceptions enumerated in the Security Agreement). CST Holdings entered into a pledge agreement, dated as of May 23, 2012 (as amended, amended & restated or otherwise modified, the "Pledge Agreement"), pursuant to which it granted BNP Paribas, as administrative agent and representative of the Prepetition Lenders, a security interest in certain equity interests owned by CST Holdings, including its equity interests in CST Industries.

37.    As of the Petition Date, the amount outstanding under the BNP Loan Agreement totaled $57.5 million, comprised of principal totaling approximately $46 million, interest totaling approximately $645,000, outstanding, undrawn letters of credit totaling approximately $10 million, a forbearance fee totaling $560,000, and outstanding fees totaling approximately $240,000.

### (ii)    The Unsecured Mezzanine Obligations

38.    CST Industries entered into a Securities Purchase Agreement, dated as of November 6, 2006, pursuant to which it issued senior subordinated notes (as amended, amended & restated or otherwise modified, the "Subordinated Notes") in the initial aggregate principal amount of $55 million. Subsequently, CST Industries executed the Amended and Restated Securities Purchase Agreement, dated as of May 23, 2012 (as amended, amended & restated or otherwise modified, the "A&R Mezzanine Purchase Agreement"), pursuant to which it issued an additional $5 million of Subordinated Notes to the two holders of such notes, The Northwestern Mutual Life Insurance Company and OCM Mezzanine Fund II, L.P. (together, the "Prepetition Mezzanine Lenders").

39.    As of the Petition Date, approximately $114.3 million remains outstanding under the A&R Mezzanine Purchase Agreement, plus fees and expenses owing to the Prepetition Mezzanine Lenders.

**C.    Circumstances Leading to the Commencement of the Chapter 11 Cases**

40.    CST has a strong business with a first-class product line.   It also has an unsustainable capital structure because of the compounding and PIK features of its obligations under the A&R Mezzanine Purchase Agreement.   This case became necessary because of a lack of liquidity, in turn caused by a chain of events put into motion by one of CST's large unsecured creditors, who rejected several attractive, formal letters of intent from third parties to purchase CST during a sale process that began in February 2016.   Those sale offers would have provided for a full payoff of CST's senior secured debt and a substantial payout to unsecured creditors. After rejecting those offers, that stakeholder also demanded that CST pay for it to hire advisors that in turn charged CST substantial fees and expenses.

41.    The failure to approve these sales, coupled with a downturn in the oil & gas market and Middle East water market over the last several months of 2016 resulting in lower than anticipated sales revenue, caused CST to default under the BNP Loan Agreement and the A&R Mezzanine Purchase Agreement in late 2016.   As a result of such defaults, CST was required to enter into multiple amendments and forbearance agreements, resulting in substantial amendment and forbearance-related fees and expenses to CST.

42.    CST estimates that it incurred approximately $8-10 million of unanticipated advisor fees and expenses (including its own) and amendment/forbearance-related fees within the last year.   For a company with EBITDA totaling $16-25 million a year, these unanticipated expenditures, totaling approximately half of its EBITDA, coupled with the market downturn and

12

the May 23, 2017 maturity of their obligations under the BNP Loan Agreement, resulted in a lack of liquidity.

### i.   The Forbearance Agreement

43.   As of early 2017, the Debtors were in default with respect to several covenants contained in the Credit Agreement and anticipated that several other defaults would occur.  Upon the occurrence of an event of default, the lenders could have accelerated the repayment of all amounts then outstanding and taken other enforcement acts.  This could have led to a disastrous result for CST.  To avoid those consequences, on March 31, 2017, CST entered into a forbearance agreement (the "Forbearance Agreement") with the Prepetition Lenders pursuant to which the Prepetition Lenders agreed to refrain from enforcing certain of their rights under the Credit Agreement through May 15, 2017 absent the occurrence of certain enumerated events that would terminate the agreed forbearance period.  Pursuant to the Forbearance Agreement, CST agreed to pay a one-time forbearance fee totaling $560,000, which amount presently remains outstanding.  The Prepetition Lenders were unwilling to extend the forbearance period beyond May 15, 2017.

### ii.   The March 2017 LOI

44.   On March 21, 2017, CST entered into a letter of intent to pursue a potential transaction to sell CST to a new entity not yet created that would be backed by a combination of a third-party purchaser and the Prepetition Mezzanine Lenders.  When CST received the draft asset purchase agreement, it was clear that the transaction structure was unworkable outside of a sale in a chapter 11 case, which would be protected by the operation of sections 363 or 1123 of the Bankruptcy Code.

13

45.    Accordingly, CST and its advisors offered several alternatives and multiple times asked the potential purchasers to restructure the deal into one that was workable and that maximized value for all of CST's stakeholders.  Unfortunately, the potential purchasers were unwilling to correct the fatal flaws in the transaction structure, which ultimately resulted in the expiration of the exclusivity period under that letter of intent.

46.    CST has remained engaged in ongoing dialogues with the potential purchasers to consider alternative structures, but did not receive any proposals prior to the Petition Date that were sufficient to obviate these Chapter 11 Cases.

### iii.    Failed Attempts to Alternative Financing

47.    Faced with a May 23, 2017 maturity under the BNP Loan Agreement and its recent liquidity constraints, CST sought to refinance its debt prior to the Petition Date.  However, CST was ultimately unable to do so.

48.    CST also both sought and received proposals from its existing lenders to provide short-term "bridge" financing, but none was on terms acceptable to CST.  CST also requested that the Pre-Petition Lenders open up the existing revolving loan facility under the BNP Loan Agreement but the lenders were unwilling to do so.

49.    Accordingly, the Debtors commenced these cases to preserve and maximize the value of their assets for the benefit of all of its stakeholders, and to finance these Chapter 11 Cases from the proceeds of the proposed debtor-in-possession financing facility pursuant to the strategy discussed below.

### D.    Restructuring Strategy

50.    By these Chapter 11 Cases, the Debtors seek to effectuate a sale of their businesses through a section 363 or 1123 sale process that enables them to restructure their obligations, improve their liquidity and resolve claims against them in an equitable and efficient manner.

14

The Debtors believe that the market response to their past sales efforts evidences a strong demand for the Debtors' business and that their sale efforts will benefit from the protections afforded to them and potential purchasers by the Bankruptcy Code.   Most importantly, the Debtors seek to continue their businesses and operations for the benefit of their present and future employees, suppliers, vendors, shippers, customers and landlords.   The Debtors hope to maintain credibility in the market as an operating company by continuing to pay employees, critical vendors, sales representatives, and assuming contracts as necessary, as described more fully below and in the First Day Motions.   The Debtors believe that a structured sale process will enable them to emerge from bankruptcy quickly and maximize value to their stakeholders.

51.    The Debtors believe, and I agree, that there is no other viable alternative to restructuring their obligations outside of a sale or chapter 11 plan of reorganization.

52.    Additionally, CST Industries sells many of its products through sales representatives, some of which are employees of the company, though some are independent sales representatives.   The Debtors believe, and I agree, that reorganizing through chapter 11 and continuing operations during this process is essential to keep their employees and sales representatives from joining the Debtors' direct competitors.   If the Debtors were to go out of business or liquidate, their market share would be picked up by their competitors.   While some employees and sales people would find jobs with competitors, many could be out of work.

53.    Moreover, through the relief sought by the First Day Motions, the Debtors seek to, and with the approval of the Court will, maintain "business as usual" for its employees, sales representatives, critical vendors, dealers and customers to ensure a smooth and seamless transition both in and out of bankruptcy for the Debtors' key constituents.

**Part II – First Day Motions**

54.    In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain First Day Motions,[3] which the Debtors filed concurrently with the filing of the Chapter 11 Cases.  The First Day Motions seek relief aimed at, among other things: (i) preserving customer and dealer relationships; (ii) maintaining vendor confidence and employee morale; (iii) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; and (iv) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process.

55.    Gaining and maintaining the support of the Debtors' customers, employees, vendors and suppliers, and certain other key constituencies, as well as maintaining the Debtors' day-to-day business operations with minimal disruption, will be critical to the success of these Chapter 11 Cases and the Debtors' efforts to preserve and maximize the value of their assets.  The approval of each First Day Motion is an important element of the Debtors' efforts to maximize value for their stakeholders and is necessary to ensure a seamless transition into chapter 11 with minimal disruption to their operations.

56.    I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to preserve and maximize the value of their assets and is thus in the best interests of the Debtors.  Factual information with respect to each First Day Motion is provided below and in the applicable First Day Motion.

---

[3]    Terms used but not otherwise defined herein have the meanings assigned to such terms in the relevant First Day Motion.

IMPAC 5242609v.1

**Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a),
Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 Directing Joint Administration
of the Debtors' Related Chapter 11 Cases (the "Joint Administration Motion")**

57.    The Debtors request that the Court authorize and direct the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.  There are three (3) affiliated Debtors in these Chapter 11 Cases.  The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by each of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all three of the Debtors.  Joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing these Chapter 11 Cases to be administered as a single joint proceeding instead of three independent Chapter 11 Cases.

58.    Joint administration of these Chapter 11 Cases will create a centralized location for the numerous documents that are likely to be filed and served in these cases by the Debtors, creditors, and parties-in-interest, and for all notices and orders entered by the Court.  A single docket will also make it easier for all parties in each of the Chapter 11 Cases to stay apprised of all the various matters before the Court.  The rights of creditors will not be adversely affected by the proposed joint administration of these Chapter 11 Cases; in fact, the rights of all of the creditors will be enhanced by the likely substantial reduction in costs resulting from joint administration of the cases.  Finally, the Debtors believe, and I agree, that the joint administration of these Chapter 11 Cases will simplify supervision of the administrative aspects of these Chapter 11 Cases for the Court and the Office of the United States Trustee for the District of Delaware.

17

59.     Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates and creditors and other parties-in-interest in these Chapter 11 Cases that the Court grant the relief requested in the Joint Administration Motion.

**Debtors' Motion for Entry of an Order Pursuant to
11 U.S.C. § 341 and 28 U.S.C. § 156(c) Authorizing the Debtors to File a
(A) Consolidated List of Creditors and (B) Consolidated
List of Debtors' Top Twenty Creditors**

60.     The Debtors request that the court authorize the Debtors to file a consolidated list of creditors and a consolidated list of the Debtors' twenty (20) largest unsecured creditors.  The Debtors have identified over a thousand entities to which notice of certain proceedings in the Chapter 11 Cases must be provided.  The Debtors anticipate that such notices will comprise, without limitation, notice of: (i) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (ii) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (iii) applicable bar dates for the filing of claims, (iv) the hearing(s) on the sale(s) of some or all of the Debtors' businesses or assets; (v) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization or liquidation; and (vi) the hearing to confirm a plan of reorganization or liquidation.

61.     The Debtors maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive such notices in the Chapter 11 Cases.  The Debtors believe, and I agree, that the information as maintained in the computer files may be consolidated and used efficiently to provide interested parties with notices and other similar documents.  Accordingly, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

62.    The Debtors also seek authority to file a single consolidated list of their twenty largest unsecured creditors in these cases.    The Debtors believe, and I agree, that a single consolidated list of their combined twenty largest unsecured creditors in the Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.    The Debtors believe, and I agree, that such relief is necessary for the efficient and orderly administration of their Chapter 11 Cases.

**Debtors' Motion for Entry of an Order Pursuant to
Bankruptcy Rules 1007(c) and 9006(b) and Local Rule 1007-1(b)
Extending the Deadline By Which the Debtors Must File
Schedules and Statements of Financial Affairs**

63.    The Debtors request entry of an order extending the Schedules and Statements Deadline for an additional fourteen (14) days beyond the sixteen (16) day extension established by the Local Rules, through and including July 24, 2017.    The Debtors believe, and I agree, that the task of assembling the Schedules and Statements in the Chapter 11 Cases will be significant and time-consuming.    Given the numerous operational matters the Debtors' legal and financial advisors must address in the early days of these Chapter 11 Cases, I believe that a modest extension would allow the Debtors' key advisors to balance their attention on operational and restructuring issues that arise during the crucial first month after the filing of the Chapter 11 Cases.    Additionally, the Debtors employ only a small number of accounting and finance personnel who are able to work with the Debtors' legal and financial advisors in preparing the Schedules and Statements.    These employees will be focused on a host of restructuring matters in the early days of the Chapter 11 Cases, in addition to continuing to perform their normal-course day-to-day tasks.    Therefore, the Debtors request a fourteen day extension to file the Schedules and Statements required in these Chapter 11 Cases.

19

**Motion of Debtors for (I) Interim and Final Authorization to (A) Continue
Their Existing Cash Management System, (B) Maintain Existing Bank Accounts
and Business Forms and (C) Continue Engagement in Intercompany Transactions, and (II)
Granting an Extension of Time to Comply with
Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

64.    The Debtors seek entry of interim and final orders granting them authorization to
(a) continue their existing cash management system and (b) maintain their existing bank
accounts and business forms.  Without the requested relief, the Debtors submit, and I agree, that
they would be unable to conduct their financial operations effectively and efficiently, which
would cause significant harm to the Debtors and to their estates.

65.    In addition to the foregoing, the Debtors request that the Court authorize and direct
all of the Banks (as defined below) to continue to maintain, service and administer the Bank
Accounts and to debit the Bank Accounts in the ordinary course of business on account of:  (a)
all checks, wires or Automated Clearing House ("ACH") transfers otherwise authorized by order
of this Court irrespective of whether such payments relate to prepetition goods or services; (b) all
checks drawn on the Bank Accounts that are cashed at the Banks or exchanged for cashier's
checks by the payees thereof prior to the Petition Date; (c) all checks or other items deposited in
one of the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid
for any reason, together with any fees and costs in connection therewith, to the same extent that
the Debtors were responsible for such items prior to the Petition Date; and (d) all undisputed
prepetition amounts outstanding as of the date hereof, if any, owed to the Banks as service
charges for the maintenance of the Cash Management System.

66.    The Debtors utilize a cash management system (the "Cash Management System"),
which is comprised of 20 bank accounts  (the "Bank Accounts"), which Bank Accounts can be
found in **Exhibit "1"** to the Proposed Order to the Cash Management Motion, located at the

IMPAC 5242609v.1

financial institutions (collectively, the "Banks") listed on Exhibit 1.  The balance of the accounts, as of May 31, 2017, is also listed on Exhibit 1.

67.     The Cash Management System used by the Debtors is centrally administered by CST Industries, the Debtors' main operating entity.  While CST Industries is one legal entity, its two dba divisions—CST Storage and CST Covers—operate and function separately, generate their own income, accrue their own expenses, and maintain their own employees, respectively. All funds generated from each division are deposited into Bank Accounts corresponding to that division.  For example, the monies generated by CST Storage are deposited, as received from customers, in a general operating account maintained by UMB Bank ("UMB").  The monies generated by CST Covers are deposited, as received from customers, in a general operating account maintained by Bank of America ("BOA").  I am informed that both of these banks are designated as authorized depositories by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") pursuant to the U.S. Trustee Chapter 11 Guidelines for the District Court of Delaware (the "Guidelines").

68.     The Bank Accounts at UMB primarily fall under three separate categories: a general operating account (the "Storage General Operating Account"); a disbursement account (the "Storage Disbursement Account"); and a payroll account (the "Storage Payroll Account"). All monies received from Storage customers are deposited into the Storage General Operating Account, the main cash concentration account for Storage.  The Storage Disbursement and Payroll Accounts are zero balance accounts and all activity is limited to the processing of payments.  To fund CST Storage's accounts payable and to satisfy payroll and other costs of operation, money is swept out of the Storage General Operating Account and into the Storage Disbursement and Payroll Accounts, respectively.  CST utilizes the Storage Disbursement

21

Account to, among other things, pay invoices from vendors, suppliers and service providers, taxes, bank fees, corporate credit cards, and other necessary expenses. CST utilizes the Storage Payroll Account for payroll and other employee obligations, such as payments for unused vacation and sick days.

69. CST Storage employs roaming construction crews that work in the field who service and install CST's products. These employees are given corporate credit cards issued by UMB. The use of these corporate credit cards is particularly important to CST's operations because their construction crew employees work in the field and are utilized by the field employees for payment of company expenses in the ordinary course, including but not limited to payment of invoices and the costs of travel, lodging, meals, supplies, and miscellaneous business expenses. The corporate credit cards are offered to prevent these employees from having to personally fund business expenses related to CST's operations. Using these corporate credit cards also eliminates the need for manual input of CST's expenses to save on accounting costs, reducing expenses and improving the accuracy and timeliness of cost reporting. CST monitors the use of the corporate credit cards for abuse and maintains a certificate of deposit with UMB in the amount of $265,000, which serves as collateral for the payment of credit card debt incurred by CST Storage employees.

70. The Bank Accounts at BOA, used by CST Covers, are structured almost identically to the Bank Accounts from UMB, as described above. Namely, there is a general operating account (the "Covers General Operating Account"), a Disbursement account (the "Covers Disbursement Account"), and a Payroll Account (the "Covers Payroll Account"). All monies received from CST Covers' customers are similarly deposited into the Covers General Operating Account, CST Covers' main cash concentration account. The Covers Disbursement and Payroll

22

Accounts are similarly zero balance accounts and all monies are swept out of the Covers General Operating Account and into the Covers Disbursement and Payroll Accounts, on an as-needed basis, to satisfy outstanding payables, respectively.

71.    CST Covers also employs a roaming construction crew that works in the field and services and installs CST's products.    CST Covers provides this construction crew with a corporate credit card issued by BOA ("BOA Card"), which is used for similar purposes as the UMB Cards.  CST Covers maintains a total credit limit of $5,000 with BOA for the BOA Card.

72.    Although the Bank Accounts at UMB and BOA handle the primary in-flows and outflows of funds associated with the Debtors' operations, the Debtors maintain other Bank Accounts of various types and for various purposes at other banking institutions in the United States and abroad, as discussed in more detail below.

73.    In addition to the primary three accounts described above, CST maintains two additional accounts with UMB: an FMH Benefit Account and an ESPC Benefit Account.  These are zero balance accounts that exist to satisfy healthcare claims submitted by employees.  The FMH Benefit Account is the account utilized for non-union employees, while the ESPC Benefit Account is utilized for union employees.  The funds for these accounts are swept in from the Storage General Operating Account as claims may arise.

74.    CST maintains four local operating accounts: Great Southern Bank ("GSB"), American National Bank ("ANB"), and two accounts in Regions Bank ("RB").  These accounts exist because a number of CST's field production employees requested live payroll checks, instead of electronic deposits.  To cater to their employees' needs, CST opened up these local accounts to provide their employees with venues to cash their checks without paying any fees or penalties.  These accounts do not maintain daily balances and are funded once a week on an as

23

needed basis from the Storage and Covers General Operating Accounts, respectively, based on the exact amount of payroll due.  I am informed that the GSB and RB Bank Accounts are located at institutions designated as authorized depositories by the U.S. Trustee pursuant to the Guidelines.

75.    CST maintains three accounts with Australian New Zealand Bank ("ANZ"), located in Ho Chi Minh City, Vietnam.  The three accounts are: one U.S. Dollar Denominated Account, where U.S. Dollars are deposited, and two separate local currency accounts, where the U.S. Dollars are converted to local currency and deposited in an account used for payroll, and another account used to settle local expenses of the representative branch.  This representative branch of CST conducts limited activities, including marketing and introducing new customers to CST, but it does not make sales or purchase inventory.  Approximately $50,000 is disbursed to these accounts on a monthly basis, which is used to pay local employees at CST Industries' representative sales office there (employees of CST Industries) and for other overhead expenses such as rent.

76.    I am informed that neither ANB nor ANZ are institutions designated as authorized depositories by the U.S. Trustee pursuant to the Guidelines.  However, the Debtors believe, and I agree, that it would be unduly burdensome and time consuming for the Debtors to open accounts at new banks in Vietnam at authorized depositories, which may not even be available.  These accounts maintain *de minimis* funds, if any, on a daily basis, as they are only funded on an as needed basis to pay necessary expenditures and effectively serve only as conduit accounts for that purpose.  Second, with regard to ANZ, Vietnam is a communist country with strict currency regulations.  The Debtors are currently in compliance with these strict regulations, and it would require substantial effort to switch banks there.

77.    CST maintains one account with JPMorgan Chase Bank ("JPM").  CST maintains a balance of $600,000 in this account.  This money is maintained with JPM in exchange for JPM issuing supporting letters of credit in favor of CST customers, particularly international customers.  I am informed that the JPM Bank Account is located at an institution designated as an authorized depository by the U.S. Trustee pursuant to the Guidelines.

78.    CST Power maintains three bank accounts with Comerica Bank ("CB") located in San Jose, California.  CST Power is an entity that employs unionized employees.  Certain of CST's customers request that union labor employees install the equipment they purchase from CST.  In response, CST dispatches the employees that CST Power employs to install and service CST's product.  The three accounts follow a similar structure to the one employed by CST Storage and CST Covers, utilizing a general operating account, a main payroll account, and a field payroll account.  I am informed that the CB Bank Account is located at an institution designated as an authorized depository by the U.S. Trustee pursuant to the Guidelines.

79.    CST Holdings maintains one bank account with UMB.  The sole purpose of this account is to pay federal income taxes incurred by CST Holdings.

80.    The Cash Management System is an ordinary course and essential business practice that provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; (iii) reduce administrative expenses by facilitating the movement of funds; and (iv) develop more timely and accurate account balance information. The Debtors believe, and I agree, that maintenance of the existing Cash Management System is in the best interest of the Debtors and their estates.

81.   In the ordinary course of business, CST uses its Cash Management System to engage in various essential intercompany transactions with CST Singapore and CST UK, resulting in intercompany receivables and payables.

82.   CST Singapore, is a separate legal entity that complies with Singapore regulations and maintains an office in Singapore employing one employee.  CST Singapore does not generate cash for itself, but instead books sales and generates revenues for CST.  CST transfers approximately $25,000 monthly to satisfy, among other things, payroll, office expenses, advertising expenses, and other necessary payables.

83.   CST UK is similarly a separate legal entity that is also cash neutral but generates revenues on behalf of CST by helping CST sell Goods and Services to customers who prefer dealing with a European entity.  CST presently believes that CST UK can sustain its operations without further intercompany loans from CST until late 2017.

84.   Additionally, the Debtors believe, and I agree, that the continued use of existing correspondence and other business forms relating to the Bank Accounts will avoid the adverse effects to the Debtors' operations which would be expected to occur if the Debtors were required to suspend essential business functions pending the production of and transition to new forms. To minimize both the disruption and expense to the Debtors' estates, the Debtors request authority to continue to use all correspondence and business forms including, but not limited to, checks, letterhead, purchase orders and invoices, as such forms were in existence immediately prior to the Petition Date.

85.   The Debtors issue a large number of checks and uses a large volume of purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms") in the ordinary course of business.  In order to minimize expenses, the

26

Debtors request that they be authorized to continue using their existing Business Forms, including electronically generated forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors-in-possession, and without adding the other related information required by the Guidelines, rather than requiring the Debtors to incur the expense, delay, and business disruption of immediately stopping the use of their existing Business Forms and to order and use entirely new business forms that strictly comply with the Guidelines.  The Debtors will replace their Business Forms with new forms identifying their status as debtor-in-possession as their existing stock is depleted.  The Debtors will use their best reasonable efforts to print "Debtor-in-Possession" on their Business Forms and checks.

86.    The Debtors believe, and I agree, that obtaining new Business Forms and implementing new electronic check forms would create significant expense and logistical difficulties.  The Debtors have publicized their case filings through press releases, and will send a notice of commencement to all known creditors.  Given such wide publication of the Debtors' status as debtors-in-possession, the Debtors believe, and I agree, that publication on checks and other business forms will add little additional notice.

87.    Accordingly, the Debtors submit, and I agree, that the relief requested in the Cash Management Motion is not prejudicial, is in the best interests of the Debtors' estates, their creditors and parties-in-interest, and the relief requested in the Cash Management Motion should be granted.

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Employee and Independent Consultant (A) Wages, Salaries, Commissions and Other Compensation, (B) Reimbursable Employee Expenses and (C) Employee Benefits; (II) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests; and (III) Granting Related Relief (the "Employee Motion")**

88.     The Debtors seek entry of interim and final orders authorizing, but not requiring, the Debtors to pay or otherwise honor, in their reasonable business judgment, (i) prepetition employee-related obligations, including wages, salaries, overtime pay, bonuses, paid leave, commissions, severance, and other accrued compensation, that were earned prior to the Petition Date, but that are scheduled to be paid postpetition; (ii) prepetition compensation owed to members of the Debtors' board of directors; (iii) prepetition compensation owed to temporary staffing agencies utilized by the Debtors to supplement their workforce; (iv) employer taxes and withholding taxes owed to federal, state and local authorities; (v) deductions of certain amounts from employees' paychecks for garnishments and contributions to various plans, programs, and arrangements, including, without limitation, the 401(k) savings plan, flexible spending and dependent care accounts, health savings accounts, supplemental life insurance, healthcare,  and other similar plans, programs and arrangements, and (vi) outstanding claims for unreimbursed business expenses and payments due on certain credit cards used by employees for business expenses (all of the foregoing prepetition employee obligations, which are further described below and in the Employee Motion, are collectively referred to hereinafter as the "Employee Obligations").   The Debtors also seek authority to pay and honor, in their discretion, unpaid pre-Petition Date amounts due to one (1) independent consultant (the "Independent Consultant") and to continue to pay amounts due to the Independent Consultant, at the Debtors' discretion, as such amounts become due and owing during the pendency of these Chapter 11 Cases.

28

89.     The Debtors also seek authorization, but not direction, to maintain, honor and continue to offer their plans, programs and policies for their employees, former employees and their respective eligible dependents, including, among other things, (i) medical, dental, and vision coverage; (ii) life insurance and accidental death and personal loss insurance; (iii) long-term disability insurance; (iv) flexible spending and dependent care accounts; (v) health savings accounts; (vi) COBRA coverage; (vii) a 401(k) retirement plan; (viii) severance guidelines and non-insider severance obligations; and (ix) other miscellaneous benefits including a group accident plan, identity theft plan, employee assistance program, automotive allowances, and tuition reimbursement program in the form they were in on the Petition Date, and to make any necessary modifications or amendments from time to time in the ordinary course of business, and to make any necessary contributions to such programs and pay any unpaid premiums, claims or amounts owed as of the Petition Date.

90.     In addition, the Debtors seek an order authorizing and directing all banks and other financial institutions to receive, process, honor and pay any and all checks or wire transfers drawn on the Debtors' accounts with respect to payments described in the Employee Motion. The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may be dishonored and to reimburse any expenses that employees may incur as a result of any bank's failure to honor a prepetition check.

91.     The Employees perform a variety of critical functions for the Debtors' businesses, including, without limitation, accounting, administration, engineering, finance, human resources, information technology, project management, manufacturing, marketing, and sales.  Their skills and specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with customers, vendors and other third parties, are essential to the

29

Debtors' continuing operations and to their ability to successfully reorganize for the benefit of the Debtors' stakeholders.  Pursuant to the Employee Motion, the Debtors request authority to pay such obligations incurred prior to the Petition Date, in an amount not to exceed $12,850 to any single Employee, plus any outstanding claims for unreimbursed business expenses and payments due on certain credit cards used by employees for business expenses.

92.     The Debtors employ approximately 482 employees, of which approximately (i) 228 are salaried employees and (ii) 254 are hourly employees.  The Debtors employ approximately nineteen (19) employees in California, ninety (90) in Illinois, one hundred and seventeen (117) in Kansas, seventy-one (71) in Missouri, ninety (90) in Tennessee, and ninety-five (95) in Texas.

93.     In addition to the employees described above, the Debtors supplement their workforce with Temporary Employees and with the services of one (1) Independent Consultant who provides the Debtors with important financial and accounting consulting services, to the extent needed, as set forth in more detail in the Employee Motion and below.

94.     *Payroll Processing Services.*   The Debtors engage Ceridian HCM, Inc. ("Ceridian") to facilitate the payment of the Wage Obligations.  The Debtors also engage Ceridian to manage the Payroll Tax filing process.  In the ordinary course of business, Ceridian pays, on behalf of the Debtors, the Wage Obligations.  The Debtors remit funds on account of their Wage Obligations to Ceridian approximately one day prior to Ceridian's disbursement to the Employees of funds on account of such Wage Obligations.  Ceridian also calculates the amount of Payroll Taxes required to be remitted each pay period, draws that amount from one of the Debtors' bank accounts, and forwards the Payroll Taxes to the applicable Taxing Authorities. The Debtors pay Ceridian fees of approximately $125,000 annually for payroll and tax

30

processing services.  To the best of the Debtors' knowledge, the Debtors do not owe Ceridian any outstanding prepetition amounts on account of payroll and tax processing services rendered because the Debtors pay for such services on a transactional basis such that amounts are paid currently each week with the associated payroll cycle for that week.  However, as of the Petition Date, the Debtors may owe certain outstanding amounts to Ceridian but are presently unaware of any such amounts.  The Debtors' nevertheless request authority to pay such amounts to Ceridian in the ordinary course as they come due.

95.    *Wages.*  The Debtors pay wages, salaries and compensation to their Employees (collectively, "Wage Obligations") on a weekly or bi-weekly basis by direct deposit, check or wire transfer.  The pay date for weekly payroll is on Thursday of the following week.  The pay date for bi-weekly payroll is Friday.  Most Salaried Employees are paid on a current basis, whereas some are paid one week in arrears.  Hourly Employees are paid one pay period in arrears, with regular wages and any overtime hours and/or adjustments during the previous cycle paid in the following cycle.  The Debtors' current estimated gross payroll per pay period is approximately $650,000 to $900,000 depending on the payroll cycle week.

96.    The Debtors' management team and I estimate that as of the Petition Date, the Debtors' liability for earned, but unpaid Wage Obligations totals approximately $650,000 (the "Prepetition Wage Obligations").  The aggregate amount of Prepetition Wage Obligations could be higher as some payroll checks from prior work periods may be and/or remain outstanding and may need to be reissued due to the Debtors' filing for chapter 11 protection.

97.    Additionally, any non-exempt Employee who works over 40 hours a week (Sunday through Saturday) is eligible for overtime pay ("Overtime") at the rate of 1.5 times such Employee's base hourly rate.

31

98.     *Bonus Programs.*  In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtors offer to Employees the opportunity to earn Bonuses pursuant to several Bonus Programs.

99.     *Performance Plus Bonus Program.*  The Debtors offer each non-management, Non-Union, non-sales Employee at the Debtors' manufacturing plants with an opportunity to earn up to $500 per year in additional compensation through the "Performance Plus Bonus Program."  Payments under the Performance Plus Bonus Program are made when a plant meets certain performance targets.  Payments under the Performance Plus Bonus Program are made twice per year.  The Debtors estimate that, as of the Petition Date, their prorated liability on account of earned but unpaid bonuses related to the Performance Plus Bonus Program is $39,900.

100.     *Sales Incentive Program* ("SIP").  The Debtors offer sales Employees bonuses under the SIP.  The next payment under the SIP is scheduled for July 2017 and will be paid out if Employees meet certain targets established in the 2017 budget, as measured in June 2017.

101.     *Management Incentive Program* ("MIP").  The Debtors offer management Employees bonuses under the MIP.[4]  The MIP is paid out annually based upon achievement of certain financial targets.  No amounts are currently outstanding under the MIP for 2016.  The MIP for 2017 will be payable in April 2018.

102.     *Non-Qualified Stock Option Plans.*  The Debtors offer two Non-Qualified Stock Option Plans for selected Employees, board members, and consultants based upon cumulative performance of the Debtors.  The Debtors do not anticipate issuing any options under the Non-Qualified Stock Option Plans for the year ending December 31, 2017.

---

[4]     The MIP includes two insiders.  However, the Debtors do not seek authority in this Motion to pay MIP bonus amounts to any insider.  If the Debtors seek to pay MIP amounts to any insider, they will seek to do so in a separate motion.

103.    *Director Compensation.*  The Debtors maintain a board of directors comprised of one Employee Director and two non-Employee Directors.   For 2017 service, each Non-Employee Director is paid $25,000 per quarter for his service on the Board ("Independent Director Quarterly Payment").   Additionally, the Directors are reimbursed for reasonable and documented business expenses they incur in carrying out their duties and responsibilities as Directors ("Expense Reimbursement," and together with the Independent Director Quarterly Payment, "Director Compensation").   As of the Petition Date the Debtors have no liability on account of earned, but unpaid, Director Cash Compensation.

104.    *Temporary Employees.*  The Debtors currently employ the services of thirty-six (36) Temporary Employees who provide services to the Debtors.  The Temporary Employees are employed by temporary staffing agencies.  The Debtors remit compensation for the Temporary Employees to the temporary staffing agencies through the Debtors' accounts payable system ("Temporary Employee Compensation").   The Debtors' average monthly spending on Temporary Employee Compensation is approximately $115,000.   As of the Petition Date, the Debtors estimate that they owe approximately $169,000 to the staffing agencies on account of Temporary Employee Compensation.

105.    *Independent Consultant.*  Furthermore, the Debtors utilize the services of one (1) Independent Consultant who provides the Debtors with important financial and accounting consulting services.   In the ordinary course of business, the Independent Consultant submits invoices to the Debtors for compensation and reimbursement of business expenses (the "Independent Consultant Compensation," and together with the Temporary Employee Compensation, the "Supplemental Workforce Obligations").   To the best of the Debtors' knowledge, the Debtors were current with respect to the Independent Consultant Compensation

33

as of the Petition Date.  However, the Debtors seek Court approval to pay any Independent Consultant Compensation for services provided or business expenses incurred prior to the Petition Date for which they did not receive an invoice and to continue paying Independent Consultant Compensation post-Petition Date in the ordinary course of business.

106.   *Paid Leave.*  As part of their overall compensation, the Debtors offer Employees certain fixed amounts of paid leave.  The Debtors' Vacation Policy provides paid leave for vacation ("Vacation Leave").  Each Employee accrues between two (2) and five (5) weeks of Vacation per year, based upon the respective Employee's years of service to the Debtors.  Each month, Employees accrue a prorated portion of their year's Vacation Leave entitlement.  The balance of an Employee's Vacation Leave is paid out if an Employee's job is terminated.  Thus, as of the Petition Date, no Employee has accrued more than 2.5 weeks of Vacation Leave.  By the Employee Motion, the Debtors are not seeking authority to pay more than $12,850 to any single Employee on account of prepetition wages, salaries or commissions.  The Debtors estimate that, as of the Petition Date, their total liability for accrued, but unpaid, vacation leave is approximately $550,000.

107.   The Employees are also provided paid holiday time off of eleven (11) days per year that Employees may use, but which they lose if they do not ("Holidays").  The Debtors do not separately account for unused Holidays.

108.   All non-union, non-exempt Employees are also provided up to four personal days per year, one per quarter ("Personal Days").  Employee can take their full annual allowance for the current year at any time during the year even it if has not yet been earned.  Personal Days cannot be carried over from one calendar year to the next.  Any Personal Days that remain unused at the end of the calendar year is paid out to Employees.

34

109.    Employees may take up to three (3) paid work days due to the death of a member of the Employee's family ("Bereavement Leave").  The Debtors do not separately account for unused Bereavement Leave.

110.    The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence," and along with Vacation Leave, Holidays, Personal Days, and Bereavement Leave, collectively, "Paid Leave"). Leaves of Absence include family medical leaves, military leaves, and jury duty, and they do not count toward an Employee's Vacation Leave.

111.    *Payroll Tax Witholdings.*  The Debtors are required by law to withhold from the Employees' salaries and wages certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholding Taxes"), and remit them to the appropriate taxing authorities (the "Taxing Authorities").  In addition, the Debtors are required to make payments from their own funds on account of Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes," and together with the Withholding Taxes, the "Payroll Taxes").

112.    In the aggregate, the Payroll Taxes, including both the employee and employer portion, typically total approximately $175,000 to $250,000 per pay period depending on the payroll cycle week.[5]   Where Employees are owed prepetition compensation amounts, the applicable Withholding Taxes have not yet been withheld.  As of the Petition Date, there are no outstanding amounts owed to the Taxing Authorities on account of Payroll Taxes.

---

[5]     Deductions vary due to, among other things, the Debtors' mix of weekly and biweekly payroll cycles.

IMPAC 5242609v.1

113.    *Garnishments.*    In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "Garnishments").    The Debtors then remit the Garnishments to the appropriate state agencies.    The Debtors currently withhold approximately $7,500 per week from Employees' wages on account of Garnishments.

114.    *Reimbursable Expenses.*    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors reimbursed Employees or remit payment directly to certain credit card companies for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").    The Reimbursable Expenses include, without limitation, expenses for work-related travel, lodging, auto expenses, telephone charges, internet charges, and meals.    Additionally, certain sales and administrative employees hold corporate credit cards issued by the American Express Company ("American Express") for Reimbursable Expenses.[6]    Employees who pay for their own Reimbursable Expenses up front, by means of a corporate American Express credit card or otherwise, can apply for reimbursement by submitting an expense report.    Once they have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse the Employees for these expenses.

115.    Additionally, certain roaming construction employees hold corporate credit cards (the "Corporate Construction Cards") secured by collateral held by the issuers of the credit cards, Bank of America, N.A. ("Bank of America") and UMB Financial Corporation ("UMB").    The

---

[6]    The American Express credit card accounts are held in the names of the Employees.    Therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate Reimbursable Expenses, the Employees may have to pay these amounts, and/or the Employees' credit histories may be negatively affected.    The Debtors presently guarantee five American Express cards held by employees who would otherwise be unable to obtain such credit.    As of the Petition Date, those five employees owed an aggregate amount totaling approximately $17,250 with respect to such American Express cards.

roaming construction employees use the credit cards to pay for business expenses, including hardware, fuel, and travel, to aid in the construction and installation of tanks or covers purchased by the Debtors' customers.  The Debtors remit payment directly to UMB and Bank of America for the monthly balances on the Corporate Construction Cards.  As of the Petition Date, the Debtors owe approximately $85,000 on account of unpaid and outstanding balances on the Corporate Construction Cards.

116.    It is impractical for the Debtors to determine the exact amount outstanding for Reimbursable Expenses at any particular time because Employees do not always submit claims for reimbursement promptly.  The Debtors estimate (based on past experience) that, as of the Petition Date, their total liability for accrued, but unreimbursed, Reimbursable Expenses (whether submitted or unsubmitted) is approximately $250,000.  Reimbursable Expenses are all incurred on the Debtors' behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming those Employees who incurred the Reimbursable Expenses in reliance on that understanding (and who may become personally liable for them), the Debtors request authority to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, and (b) pay to the Employees up to the estimated amount of $335,000 on an interim basis, and up to $425,000 after entry of a final order, on account of all Reimbursable Expenses that (i) became payable prepetition, and (ii) accrued prepetition but only became payable after the Petition Date.

117.    *Insurance and Health Benefits.*  As described in more depth in the Employee Motion and below, the Debtors offer medical, dental, vision, life, accidental death and personal injury, and long-term disability insurance plans to their Employees, as well as flexible spending and dependent care accounts, health savings accounts, and COBRA benefits.

37

118.    *Medical Plans.*    The Debtors currently offer medical benefits to their eligible Employees and their dependents through self-funded plans (the "Medical Plans") administered by CoreSource ("CoreSource").    The Debtors set the Employees' premiums based upon market comparisons and estimates of the plan expenses.    The Debtors are required to pay for all costs arising under the Medical Plans, including claims payments and associated administrative costs, but Employees are responsible for satisfying the annual deductible and for paying copayments to a network provider.    Employees are eligible to participate in the Medical Plans on the first of the month following thirty (30) days of continuous employment.    Currently, the Debtors provide benefits under the Medical Plans to approximately 465 Employees, approximately 417 of whom are Non-Union Employees and 48 of whom are Union Employees.

119.    Claims under the Medical Plans are self-funded on a "pay as you go" basis and average approximately $575,000[7] per month.    During the past six months, the Debtors paid approximately $3,450,000 in Employee claims under the Medical Plans.    Open enrollment for the Medical Plans will begin in November 2017 with Employees' enrollment choices taking effect on January 1, 2018.    As of the Petition Date, the Debtors estimate that their liability on account of incurred but unpaid medical claims for Employees is approximately $1,200,000.

120.    The Debtors also pay approximately $50,000 per month to CoreSource in administrative fees for their services in connection with the Medical Plans.    The Debtors also carry stop-loss insurance to cover any individual's claims in excess of the amount of estimated claims in a calendar year.    The Debtors pay $45,000 per month for such stop-loss coverage provided by American International Group.    As of the Petition Date, there are no unpaid and outstanding administrative fees and premiums on account of the Medical Plans.

---

[7]    This amount includes amounts owed on account of COBRA extended group health benefits, discussed below.

121.     *Dental Plans.*  The Debtors offer dental benefits to eligible Employees and their dependents through a preferred provider organization plan administered by Cigna (the "Dental Plans").  The Dental Plans are not self-funded.  Employees are eligible to participate in the Dental Plans on the first day of the calendar month coincident with or following thirty (30) days of employment.  Currently, the Debtors provide benefits under the Dental Plans to approximately 447 Employees, 400 of whom are Non-Union Employees and 47 of whom are Union Employees.  The Debtors pay approximately 30% of the premiums for all participating Employees and their dependents; such payments cost the Debtors approximately $9,000 per month in the aggregate.  As of the Petition Date, the Debtors estimate that they owe approximately $9,000 in unpaid and outstanding premiums on account of the Dental Plans.

122.     *Vision Plan.*  The Debtors offer vision benefits to their eligible Employees and their dependents through a plan (the "Vision Plan") administered by Vision Service Plan Insurance Company ("VSP").  The Vision Plan is not self-funded.  Employees are eligible to participate in the Vision Plan on the first day of the calendar month coincident with or following thirty (30) days of employment.  Currently, the Debtors provide benefits under the Vision Plan to approximately 364 Employees, 325 of whom are Non-Union Employees and 39 of whom are Union Employees.  The Employees pay 100% of the premiums of the Vision Plan.  The premium funds are deducted from the Employees' paychecks and remitted to VSP.  The Debtors estimate that, as of the Petition Date, they are holding approximately $6,500 in deductions for remittance to VSP.

123.     *Life, Accidental Death and Personal Injury, and Long-Term Disability Insurance.* The Debtors provide life insurance, long term disability, and accidental death and personal loss

insurance coverage to certain eligible Employees under policies issued by Aetna Life Insurance Company ("Aetna").

124.    Full-time Employees of CST Industries, Inc. (excluding temporary and seasonal Employees) are eligible to participate in the long term disability plans (the "Long Term Disability Plans") on the first day of the calendar month coincident with or following thirty (30) days of continuous employment.  The Long Term Disability Plans provides benefits equal to 60% of each Employee's base monthly earnings.

125.    Full-time Employees are eligible to participate in the life insurance and accidental death and personal loss insurance plan (the "Life Insurance and AD&D Plans") if they are Employees of CST Industries, Inc. or Salaried Employees of CST Power and Construction on the first day of the calendar month coincident with or following thirty (30) days of continuous employment.

126.    The Life Insurance and AD&D Plan for full-time Employees in the DeKalb Union provides a maximum benefit of up to $25,000.  The Life Insurance and AD&D Plan for full-time Salaried Employees of CST Industries, Inc. or Salaried Employees of CST Power and Construction provides a benefit equal to one times basic earnings up to a maximum benefit of $500,000.   The Life Insurance and AD&D Plan for full-time Hourly Employees of CST Industries, Inc. provides a benefit equal to one times basic earnings up to a maximum benefit of $50,000.   The Debtors pay approximately $7,000 per month to Aetna for premiums in connection with the Long Term Disability Plan and $6,500 per month in connection with the Life Insurance and AD&D Plan.  As of the Petition Date, the Debtors estimate that there are $7,000 in unpaid and outstanding premiums on account of the Long Term Disability Plans and $6,500 in unpaid and outstanding premiums on account of the Life Insurance and AD&D Plans.

127.    The Debtors offer full-time Employees the ability to purchase supplemental life insurance for Employees, their spouses or their children ("Supplemental Life Insurance") through Aetna.  Currently Employees have purchased 627 life policies through the Supplemental program with a total aggregate monthly premium of $10,133.  As of the Petition Date, the Debtors estimate there are $10,133 in unpaid and outstanding premiums.

128.    The Debtors offer full-time Employees of CST Industries (excluding temporary and seasonal Employees and Union Employees at the Debtors' DeKalb plant) and Salaried Employees of CST Power and Construction a self-funded income replacement plan for employees unable to work due to illness, pregnancy or injury.  The plan provides a benefit equal to 67% of base monthly earnings for a maximum of six months per calendar year.

129.    *Flexible Spending and Dependent Care Accounts.*  The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care expenses and premiums and dependent care expenses (the "Flexible Spending Accounts").  Currently, approximately 102 Employees maintain Flexible Spending Accounts.  The funds deducted from the Employees' paychecks for contribution to the Flexible Spending Accounts are remitted to Discovery Benefits, Inc. ("Discovery"), which administers claims and remits reimbursements to Employees.  The Debtors pay Discovery approximately $535 per month to administer the Flexible Spending Accounts, and the Debtors currently withhold approximately $7,000 per month on account of Employee contributions to the Flexible Spending Accounts.  The Debtors believe that as of the Petition Date, they are holding $3,500 in Flexible Spending Account deductions for remittance to Discovery and owe $535 on account of incurred, but unpaid, prepetition expenses in connection with the Flexible Spending Accounts.

41

130.     *Health Savings Accounts.*  The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to health savings accounts ("Health Savings Accounts") to pay for eligible out-of-pocket health care expenses.  Currently, approximately 102 Employees maintain Health Savings Accounts.  The funds deducted from the Employees' paychecks for contribution to the Health Savings Accounts are remitted to Discovery, which administers claims and remits reimbursements to Employees.  The Debtors pay Discovery approximately $300 per month to administer the Health Savings Accounts, and the Debtors currently withhold approximately $18,000 per month on account of Employee contributions to the Health Savings Accounts.  The Debtors estimate that, as of the Petition Date, they are holding approximately $4,500 in Health Savings Account deductions for remittance to Discovery and owe approximately $300 on account of incurred, but unpaid, prepetition expenses in connection with the Health Savings Accounts.

131.     *COBRA.*  The Debtors pay in the ordinary course of business certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former employees and their dependents (the "COBRA Coverage").  Only nine (9) former employees currently receive COBRA Coverage.    The Debtors' COBRA Coverage is administered by Discovery for a fee of $400 per month (the "COBRA Program").  Under the COBRA Program, an Employee may elect to receive COBRA Coverage for the continuance of the Medical Plans, Dental Plans, Vision Plans, Employee Assistance Program and Flexible Spending Program.  As of the Petition Date, the Debtors' owe approximately $400 in unpaid and outstanding administrative fees on account of the COBRA Program.

132.     *401*(k) Plan.    The Debtors offer their Employees a tax-qualified defined contribution retirement plan (the "401(k) Plan").    Approximately 460 Employees currently

contribute to the 401(k) Plan.  Prudential ("Prudential") holds these accounts as plan trustee.  Full-time Employees and part-time Employees who have completed thirty (30) days of employment are automatically enrolled at the beginning of the quarter and may elect to contribute a percentage of their eligible compensation to the 401(k) Plan on a pre-tax basis.  The Debtors make matching contributions to each Employee participant's account under the 401(k) Plan equal to 50% of an Employee's salary deferrals, up to 3% of an Employee's compensation (the "Matching Contributions").  The current Matching Contributions under the 401(k) Plan do not totally vest until an Employee has completed three (3) years of service with the Debtors (although Matching Contributions vest 33% after one year of service and 67% after two years of service).  However, under IRS guidelines, termination of the 401(k) Plan will cause all unvested amounts to become automatically vested at the time of plan termination.  The majority of the Employees are already 100% vested as of the Petition Date.  The Debtors plan on continuing to make the Matching Contributions.

133.    The Debtors deduct contributions from participating Employees' paychecks and remit contribution amounts to Prudential.  The approximate monthly amount withheld from such Employees' paychecks for 401(k) Plan contributions is $215,000.  On average, the Debtors pay *approximately* $80,000 per pay period in Matching Contributions.  The Debtors are not currently holding any funds on account of Employee contributions and Matching Contributions accrued prepetition.

134.    The Debtors do not pay Prudential any fees in connection with Prudential's *administration* of the 401(k) Plan unless the Debtors make a request that is considered outside the normal and customary services provided by Prudential, which the Debtors do not expect to happen.

43

135.    *Defined Benefit Pension Plan.*    The Debtors maintain a defined benefit pension plan, the CST Industries, Inc. Columbian Tectank Division Employees Defined Benefit Plan And Trust (the "Pension Plan"), which provides benefits to approximately thirty-eight (38) former employees and certain eligible family members of deceased former employees (the "Pension Participants") of a manufacturing facility that was closed approximately fifteen (15) years ago. The Pension Plan makes monthly fixed payments to each of the Pension Participants from assets administered by a plan trustee.  Prior to the Petition Date, the Debtors made payments to meet certain funding requirements for the Pension Plan.  The Debtors believe that they have paid all contributions required to have been made under the Pension Plan through the Petition Date.  The relief sought by the Debtors in this Motion does not include authorization for the Debtors to continue making Pension Plan contributions.

136.    *Severance.*    In the ordinary course of business, the Debtors have an informal set of guidelines pursuant to which, in the discretion of the Debtors' management, they offer severance payments to certain Employees whose employment has been involuntarily terminated (the "Severance Guidelines").    Under the Severance Guidelines, these Employees receive, upon involuntary termination, a severance payment equal to one (1) of such Employee's base salary for each full year employed by the Debtors, with a minimum severance payment equal to two (2) weeks of such Employee's base salary and a maximum equal to twenty (20) weeks of such Employee's base salary.

137.    There are also approximately six (6) non-insider Employees who are parties to certain agreements with the Debtors, which entitle them to a severance payment upon involuntary termination *equal* to approximately three (3) months to one (1) year of such Employee's base salary (the "Severance Agreements" and together with the Severance

44

Guidelines, the "Severance Program").  Under the Severance Program, some or all of these Employees may be entitled to postpetition severance payments upon involuntary termination of their employment.

138.    The Debtors believe it is critical to maintaining the Employees' morale and loyalty that they be authorized to continue providing severance benefits to Employees who do not qualify as "insiders," as that term is defined in section 101(31) of the Bankruptcy Code, in the ordinary course of business after the Petition Date (the "Non-Insider Employees").  The Debtors further seek authority to *pay* postpetition the administrative portion of any Non-Insider Employee's severance claims under the Severance Program as such claims come due in the ordinary course.  The Debtors cannot afford for such Non-Insider Employees to leave their jobs while the Debtors continue to need their services during this critical process.  Notably, it may be difficult for the Debtors to attract new employees of comparable quality and character.  Moreover, even if otherwise available, new employees would lack the unique knowledge and historical perspective with respect to the Debtors possessed by the Non-Insider Employees.  By granting the relief requested herein, the Debtors will be able to assure the Non-Insider Employees that they will continue to be entitled to receive the same benefits that they were entitled to receive prior to the Petition Date.  By the Employee Motion, the Debtors are not seeking authority to make any prepetition or postpetition payments to any insiders on account of the Severance Program.

139.    *Other Employee Benefit Programs.*  The Debtors offer several other benefit programs to their Employees.

140.    *Employee Assistance Program.*  The Debtors offer an Employee Assistance Program to all Employees through New Directions Behavioral Health ("EAP").  The EAP is a

45

confidential service that provides Employees and their families with professional counseling and referral services. The Debtors pay the quarterly premiums of $3,000 for the EAP. As of the Petition Date, the Debtors estimate that they owe approximately $3,000 on account of the EAP.

141. *Voluntary Group Accident Plan.* The Debtors offer accident coverage (the "Voluntary Group Accident Plan") through Cigna to all full-time Employees of CST Industries, Inc. (excluding temporary and seasonal Employees and Union Employees at the Debtors' DeKalb plant) and full-time salaried Employees of CST Power and Construction. The Voluntary Group Accident Plan coverage can pay a lump-sum benefit for off-the-job accidents, plus benefits that correspond with medical treatment. Currently, the Debtors provide benefits under the Voluntary Group Accident Plan to approximately 154 Employees. The Employees pay 100% of the premiums of the Voluntary Group Accident Plan. The premium funds are deducted from the Employees' paychecks and remitted to Cigna. The Debtors estimate that, as of the Petition Date, they are holding approximately $2,200 in deductions for remittance to Cigna on account of the Voluntary Group Accident Plan.

142. *Voluntary Identity Theft Plan.* The Debtors offer a voluntary identity theft plan (the "Voluntary Identity Theft Plan") through ID Watchdog, Inc. ("ID Watchdog") to all full-time Employees of CST Industries, Inc. (excluding temporary and seasonal Employees and Union Employees at the Debtors' DeKalb plant) and full-time salaried Employees of CST Power and Construction. The coverage provides credit protection services and proactive identity monitoring. Currently, the Debtors provide benefits under the Voluntary Identity Theft Plan to approximately 71 Employees. The Employees pay 100% of the premiums of the plan. The premium funds are deducted from the Employees' paychecks and remitted to ID Watchdog. The

46

Debtors estimate that, as of the Petition Date, they are holding approximately $850 in deductions for remittance to ID Watchdog.

143.    *Tuition Reimbursement Program.*    The Debtors offer a tuition reimbursement program to Employees, on a case-by-case basis, for classes towards a degree related to an Employees' position with the Debtors.    Currently, one (1) employee is enrolled in such classes. As of the Petition Date, no amounts are due and outstanding under the Tuition Reimbursement Program.

144.    *Automotive Allowances.*    The Debtors have three employees who receive bi-weekly automotive allowances (the "Auto Allowances").    In the aggregate, the Auto Allowances total approximately $575 biweekly.

**Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a), Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing the Debtors to Pay Certain Independent Sales Representatives Prepetition (A) Contractual Commissions, (B) Fixed Compensation, and (C) Reimbursable Business Expenses; (II) Authorizing and Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests; and (III) Granting Related Relief (the "Independent Sales Representatives Motion")**

145.    The Debtors seek entry of an order authorizing, but not requiring, the Debtors to pay or otherwise honor, in their reasonable business judgment, all prepetition (i) commissions to Independent Sales Representatives, (ii) fixed compensation to Independent Sales Representatives, and (iii) reimbursable Independent Sales Representative business expenses (the foregoing prepetition obligations, which are further described below, are collectively referred to hereinafter as the "Independent Sales Representative Obligations").

146.    In addition, the Debtors seek an order authorizing and directing all banks and other financial institutions to receive, process, honor and pay any and all checks or wire transfers drawn on the Debtors' accounts with respect to payments described in this Motion.    The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any

47

checks that may be dishonored and to reimburse any expenses that Independent Sales Representatives may incur as a result of any bank's failure to honor a prepetition check.

147.    In the ordinary course of their businesses, the Debtors incur various obligations, including debts related to Commissions on sales of Debtors' products, fixed compensation pursuant to contracts, and reimbursable business expenses, related to the Independent Sales Representative Agreements.

148.    These Independent Sales Representative Agreements provide that the Independent Sales Representatives will promote and sell the Debtors' products in certain territories defined in each contract.  In exchange, the Independent Sales Representative Agreements compensate the Independent Sales Representatives with Commissions on sales of products made by the Independent Sales Representatives and, in some cases, Fixed Compensation amounts.  Each of the Independent Sales Representative Agreements describes the Commissions that are paid to the applicable Independent Sales Representative.

149.    Additionally, the Independent Sales Representative Agreements provide for the reimbursement of costs, expenses, and liabilities incurred by the Independent Sales Representatives in connection with their activities under the Independent Sales Representative Agreements.

150.    The Debtors have incurred obligations to the Independent Sales Representatives in the period prior to the Petition Date.  I understand that certain of these obligations are currently payable as of the Petition Date, while others will become due and payable in the ordinary course of the Debtors' businesses after the Petition Date.

151.    The Independent Sales Representatives perform a variety of functions that I believe are critical for the Debtors' businesses, including, without limitation, maintaining

48

employees, salespersons, agents and associate representatives with the technical knowledge and proficiency necessary to sell the Debtors' products.  Although many of the Independent Sales Representatives are located in the United States, the Debtors also rely on Independent Sales Representatives in countries in which the Debtors do not have employees present, including Argentina, Australia, Brazil and Indonesia.  The skills, specialized knowledge and understanding of the Independent Sales Representatives and their employees, salespersons, agents and associate representatives, as well as their relationships with customers and other third parties, are essential to the Debtors' continuing operations and to the Debtors' ability to successfully reorganize for the benefit of the Debtors' stakeholders.  Pursuant to the Independent Sales Representatives Motion, the Debtors request authority to pay such obligations incurred prior to the Petition Date.

152.    As described in the Independent Sales Representatives Motion, in the ordinary course of the Debtors' businesses, Debtors consider Commissions earned upon the receipt by the Debtors of a predetermined percentage of a customer's payment.  While precise estimates are difficult because they depend on when customers make payments to the Debtors, over the prior three months the Debtors' Commissions payment have averaged approximately $75,000 per month.

153.    Certain of the Independent Sales Representatives are individuals or corporations with only one (1) employee.  For all such Independent Sales Representatives, the Debtors seek authorization to pay Commissions or other compensation only up to $12,850 per Independent Sales Representatives for outstanding prepetition amounts owed, in addition to amounts owed on account of expense reimbursement obligations.

154.    In the ordinary course of the Debtors' businesses, the Debtors pay fixed compensation amounts to approximately eight (8) Independent Sales Representatives on a

49

regular basis as provided in the applicable Independent Sales Representative Agreement. Additionally, one (1) Independent Sales Representative is compensated in part in the form of an automobile allowance of approximately $2100 per month (collectively, the "Fixed Compensation").  The Debtors estimate that they pay an average of approximately $44,000 per month in Fixed Compensation to the Independent Sales Representatives, although that amount can vary significantly because certain of the Independent Sales Representatives are paid on a quarterly basis.

155.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors reimbursed the Independent Sales Representatives for costs, expenses and liabilities incurred by the Independent Sales Representatives in connection with their activities under the Independent Sales Representative Agreements (the "Reimbursable Expenses").    The Reimbursable Expenses include, among other things, expenses for work-related travel, lodging, telephone charges, internet charges and meals.    Under the terms of the Independent Sales Representative Agreements, Independent Sales Representatives pay such Reimbursable Expenses and must then submit expense reports to the Debtors.

156.    It is impractical for the Debtors to determine the exact amount outstanding for Reimbursable Expenses at any particular time because Independent Sales Representatives do not always submit claims for reimbursement promptly.    The Debtors estimate (based on past experience) that, as of the Petition Date, their total liability for accrued, but unreimbursed, Reimbursable Expenses (whether submitted or unsubmitted) is approximately $30,000. Reimbursable Expenses are all incurred for purposes of carrying out the goals of the Independent Sales Representative Agreements, and with the understanding that they will be reimbursed.

157.     Accordingly, to avoid harming those Independent Sales Representatives who incurred the Reimbursable Expenses in reliance on that understanding, the Debtors request authority to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, and (b) pay all Reimbursable Expenses to the Independent Sales Representatives that either (i) became payable prepetition, or (ii) accrued prepetition but only became payable after the Petition Date, up to the estimated amount of $30,000 on an interim basis and $50,000 on a final basis.

**Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Continue Their Workers' Compensation Programs and Their Liability, Property, and Other Insurance Programs and (B) Pay Certain Obligations in Respect Thereof and (II) Authorizing and Directing the Debtors' Financial Institutions to Honor and Process Checks and Transfers <u>Related to Such Obligations (the "Insurance Motion")</u>**

158.     The Debtors request entry of an order, (i) authorizing the Debtors to continue their liability, property, workers' compensation and other insurance programs (collectively, the "<u>Insurance Programs</u>"); (ii) authorizing and directing the Debtors' financial institutions to honor and process checks and transfers related to such obligations; and (iii) authorizing the Debtors to pay, in their sole discretion, all undisputed premiums, claims, deductibles, administrative fees, broker fees and other obligations relating to the Insurance Programs as applicable, that were or are due and payable, and relate to the period before or after the Petition Date (collectively, the "<u>Insurance Obligations</u>").  As of the Petition Date, the Debtors estimate that they do not owe any unpaid and outstanding prepetition Insurance Obligations.

159.     In connection with the operation of their businesses, the Debtors maintain the Insurance Programs through several different insurance carriers (the "<u>Insurance Carriers</u>").  The Insurance Programs provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability, workers' compensation, directors' and officers' liability

(including excess liability), foreign general liability, fiduciary liability, commercial property liability, auto liability, contractors' equipment, professional coverage (architects and engineers), crime, and various other property-related and general liabilities.  The Debtors do not presently owe any amounts on account of premiums under these contracts.  The Debtors believe, and I agree, that continuation of the Insurance Programs is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from catastrophic liability.

160.    The Debtors are required to pay premiums under the Insurance Programs based upon rates established by the applicable Insurance Carrier.  For the 2016/2017 policy period, the annual premiums for the Insurance Programs totaled approximately $1,661,628 in the aggregate. In addition to annual premiums, the Debtors may be required to pay various deductibles and retentions for claims asserted under the Insurance Programs.  The amounts of the applicable deductibles and retentions are set forth in **Exhibit "B"** to the Insurance Motion.  As of the Petition Date, the Debtors' management team and I estimate that the Debtors have paid all monthly charges and retrospective premium adjustments that have been billed by the Insurance Carriers for all periods through the beginning of August 2017.  However, pursuant to the Insurance Motion, the Debtors are seeking authority to pay any undisputed obligations under the Insurance program, in their discretion, as they come due.

161.    The Debtors are required to maintain workers' compensation coverage in each state in which they have employees, in order to cover claims arising from or related to such employment (the "Workers' Compensation Program").  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Workers' Compensation Premiums. Under the Workers' Compensation Program, the Debtors are insured through Third Coast Underwriters for statutory liabilities with a $1,000,000 per occurrence coverage in all fifty states.

162.    The Workers Compensation Program expired on August 9, 2016, at which time the Debtors renewed their policies through August 9, 2017 and paid a premium deposit in the amount of $476,046.  Although the Debtors do not believe that they need Court approval to amend, extend or renew the Workers' Compensation Program in the ordinary course of business or pay any associated premiums in connection with such amendment, extension or renewal, through the Insurance Motion the Debtors seek the authority to do so out of an abundance of caution.

163.    The nature of the Debtors' business and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future.  If the Insurance Programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which could have an extremely negative impact on the Debtors' ability to maximize the value of their assets for stakeholders. Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what would likely be a significantly higher cost to their estates.  Accordingly, I believe that it is necessary for the Debtors to meet all Insurance Obligations with respect to the Insurance Programs.

164.    Accordingly, the relief requested in the Insurance Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors.  The Debtors

submit, and I agree, that the relief requested in the Insurance Motion is in the best interests of the

Debtors' estates, their creditors and parties-in-interest.

**Debtors' Motion for Entry of Interim and Final Orders Pursuant to
11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing
or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming
Utilities Adequately Assured of Future Performance, and (III) Establishing
Procedures for Determining Adequate Assurance of Payment
(the "Utilities Motion")**

165.    The Debtors respectfully request the entry of an interim order and final order, (i)

determining that the Utility Providers (defined below) have been provided with adequate

assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving

the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers

may request additional or different adequate assurance; (iii) prohibiting the Utility Providers

from altering, refusing or discontinuing services on account of prepetition amounts outstanding

or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (iv)

determining that the Debtors are not required to provide any additional adequate assurance

beyond what is proposed in the Utilities Motion.

166.    In the ordinary course of business, CST regularly incurs utility expenses for

telephone, electric, gas, water, internet access, and other services (the "Utility Services").  The

Debtors' aggregate average monthly cost for utility services is approximately $297,435.00.  The

utility services are provided by approximately thirty-three (33) utility companies (the "Utility

Providers").

167.    As of the Petition Date and as qualified in the Utilities Motion, the Debtors are

generally current on payments to the Utility Providers for Utility Services.  Overall, the Debtors

have a long and established payment history with most of the Utility Providers indicating

consistent payment for Utility Services with few to no material defaults or arrearages with

respect to undisputed Utility Services invoices.  As of the Petition Date, however, the Debtors may have had (a) prepetition accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for Utility Services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for prepetition Utility Services for which the Debtors had not yet been billed.

168.    Access to Utility Services is critical to the Debtors' ongoing operations while they are exploring their strategic options.  Should any Utility Provider refuse or discontinue a service even for a brief period of time, the Debtors' operations and administrative functions would suffer significant harm.  Any interruption of the Utility Services would be severely disruptive to the Debtors' businesses and diminish the Debtors' value to the detriment of their stakeholders. Certain Utility Providers provide the Debtors with services necessary to run their day-to-day operations.  Further, the Debtors are dependent upon internet and telephone service to maintain their ability to send and receive electronic communications and records.  In this regard, the Debtors believe, and I agree, it is in the best interest of the Debtors, their estates and their creditors to maintain continuous and uninterrupted Utility Services during these Chapter 11 Cases.

169.    As adequate assurance of future payment to the Utility Providers, the Debtors propose to deposit cash in an amount equal to the approximate aggregate cost of 50% of the average monthly total for utility service from the Utility Providers calculated from an historical average for the three months prior to the Petition Date, or $148,717.63.

170.    Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party-in-interest and, in fact, only benefits the Debtors' estates and their creditors.  Accordingly, I submit that the proposed adequate assurance is sufficient and that the

relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and parties-in-interest.

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing
the Debtors to Pay Certain Prepetition Taxes and Regulatory Fees in
the Ordinary Course of Business and (II) Authorizing Banks and
Financial Institutions to Honor and Process Checks and Transfers
Related Thereto (the "Taxes Motion")**

171.    The Debtors respectfully request the entry of interim and final orders, (i) authorizing the Debtors to pay certain prepetition taxes and regulatory fees in the ordinary course of business; and (ii) authorizing banks and financial institutions to honor and process checks and transfers related thereto.

172.    In the ordinary course of business, the Debtors (i) incur taxes including, without limitation, sales and use taxes (the "Sales and Use Taxes"), property taxes (the "Property Taxes"), and other miscellaneous taxes (together with the Sales and Use Taxes, and Property Taxes, the "Taxes"); (ii) incur business license, environmental, reporting, commercial, and vehicle fees and other similar assessments (collectively, the "Fees"); and (iii) remit such Taxes and Fees to various taxing, licensing and governmental authorities (collectively, the "Authorities") or make payments to various third parties for Taxes who, in turn, remit such Taxes to the Authorities.  The Debtors seek authorization to pay any Taxes and Fees (including amounts paid prepetition by checks that have not yet cleared as of the Petition Date) on an interim basis up to an aggregate amount of $1 million, which is the aggregate maximum sum that the Debtors currently believe may be due on account of prepetition Taxes and Fees, and on a final basis up to the aggregate amount of $1.5 million.

173.    The Debtors' management team and I estimate that the Debtors owe approximately $1.36 million to various Authorities on account of prepetition Taxes and Fees.  As

56

explained more fully in the Taxes Motion, the relief requested therein should be granted because, among other things, (a) certain Taxes may constitute "trust fund" taxes and thus are not property of the Debtors' estates; (b) the failure to pay certain Taxes could result in a lien being placed on the Debtors' property; and/or (c) such Taxes constitute priority claims.  The failure to pay the Taxes could disrupt the Debtors' operations and impair the Debtors' efforts to maximize the value of their assets for their stakeholders.  Accordingly, the Debtors believe, and I agree, payment of the Taxes and Fees is in the best interest of the Debtors' estates and therefore request that the Taxes Motion be granted.

**Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens and Providing for Superpriority Claims; (IV) Granting Adequate Protection to Prepetition Secured Lenders; (V) Modifying The Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief (the "DIP Motion")**

174.    The Debtors request entry of orders, on interim and final bases (together, the "DIP Orders"): (i) authorizing the Debtors to (a) obtain or guarantee secured, superpriority, postpetition financing in an aggregate principal amount not to exceed $15 million (the "DIP Facility" or the "DIP Financing Agreement"), pursuant to the terms and conditions of the DIP Loan Documents by and between CST Industries, Inc. as Borrower, CST Holdings and CST Power as Guarantors, the DIP Agent, and the DIP Lenders; (b) authorizing the Debtors to execute and deliver the DIP Financing Agreement and all related documentation; (c) granting liens and superpriority administrative expense claims to the Debtors' postpetition lenders; (d) authorizing the Debtors to use Cash Collateral; (e) granting adequate protection to prepetition secured parties; (f) modifying the automatic stay as to the Debtors' postpetition lenders to allow implementation of the Debtors' postpetition financing, the Interim Order, and the Final Order; and (g) granting related relief, including scheduling an Interim Hearing to consider immediate

entry of the Interim Order, scheduling a Final Hearing to consider entry of the Final Order, and finding that any applicable notice requirements or stay provisions of the Bankruptcy Rules and Local Rules are hereby satisfied or waived.

175.    The DIP Financing Agreement provides for a postpetition loan commitment in an aggregate principal of up to $15 million that shall consist of (i) extensions of new revolving loans (the "DIP Revolving Loans"); and (ii) $2 million that may be used for purpose of cash collateralizing and obtaining letters of credit.  Initially, for 120 days after the closing date, the DIP Revolving Loans will be available in an aggregate outstanding principal amount of $12 million.  The DIP Revolving Loans may be extended, at CST's request and with the consent of the DIP Lenders, for two (2) additional thirty (30) day periods.  The DIP Financing Agreement provides for an aggregate outstanding principal amount of DIP Revolving Loans of $12.5 million during the first thirty (30) day extension period and an aggregate outstanding principal amount of $13 million during the second thirty day extension period.  In this final period, the $2 million available with respect to letters of credit may be used as cash in accordance with the budget or for cash collateralizing letters of credit.

176.    The Debtors believe, and I agree, that they have an immediate and critical need to obtain postpetition financing under the DIP Facility based upon their current liquidity position and in order to preserve and maximize the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facility is vital to the Debtors' efforts to maintain operations during these Chapter 11 Cases.  Consequently, I believe that without access to the DIP Facility, the Debtors and their estates would suffer immediate and irreparable harm because they would not have enough money to

operate through the pendency of their respective reorganizations and the sale process envisioned by the Debtors.

177.    The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  The Debtors are unable to obtain (i) adequate unsecured credit, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of the Debtors' estates and (b) a junior lien on encumbered assets, or (iii) secured credit from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The only source of secured credit available to the Debtors on acceptable terms, other than the use of cash collateral, is the DIP Facility.  The Debtors require additional financing under the DIP Facility in order to satisfy their postpetition liquidity needs.

178.    In the days and weeks prior to the commencement of these Chapter 11 Cases, the Debtors explored alternative financing from a number of potential lenders and from a variety of financial institutions.  Prior to the Petition Date, the Debtors and their financial advisors surveyed various sources of prospective postpetition financing by contacting fourteen (14) lending institutions.  Despite diligent efforts, the Debtors have been unable to find a lender willing to extend credit on an unsecured basis or on more favorable terms than those offered by the proposed DIP Lenders.

179.    Together with its counsel and financial advisors, the Debtors considered available financing options and determined that available credit on more favorable terms was unavailable to the Debtors.  Accordingly, the Debtors believe in their business judgment, and I agree, that the terms set forth in the DIP Financing Agreement are the most favorable to and in the best interests of the Debtors' estates and creditors.

IMPAC 5242609v.1

**Motion of Debtors for Interim and Final Order Authorizing the Debtors to
(I) Honor Prepetition Obligations to and (II) Continue Prepetition Practices with Certain
Critical Vendors (the "Critical Vendors Motion")**

180.    The Debtors respectfully request the entry of interim and final orders authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (i) pay the Critical Vendor Claims in the aggregate amount not to exceed $2.4 million (the "Critical Vendor Cap"), $915,000 of which the Debtors seek to pay on an interim basis pending a final hearing on this Motion (the "Interim Critical Vendor Cap");[8] and (ii) continue during the postpetition period their prepetition practices with the Critical Vendors.

181.    The Critical Vendors provide goods or services necessary to the Debtors' ordinary-course manufacture and sale of storage tanks, aluminum domes and specialty covers and the Debtors would not be able to practically or economically replace these Critical Vendors within the time frames needed to obtain the goods or services.  These Critical Vendors all, among other things, either (i) supply steel, hardware, accessories, tools, and other key manufacturing components which are necessary for manufacturing, designing, constructing,  and installing the factory coated metal storage tanks, aluminum domes, and specialty covers that the Debtors distribute and sell (the "Goods"), or (ii) provide installation or construction services which are essential for manufacturing, delivering, installing, and servicing with respect to the Debtors' products (the "Services").

182.    If the Debtors fail to pay the Critical Vendors who supply the Goods and Services, the Debtors face the risk that these Critical Vendors will no longer provide these Goods

---

[8]    The Debtors conduct a portion of their business with the Critical Vendors through the payment of invoices by check.  The Debtors have endeavored to determine which of the checks issued to the Critical Vendors have yet to be honored, and to the best of their ability, such amounts are included in their request for authority to pay, in their discretion, the Critical Vendor Claims. However, pursuant to the Critical Vendors Motion, the Debtors reserve the right to seek to increase the Critical Vendor Cap at a later date if necessary, subject to this Court's approval, for this or any other reason.

and Services to the Debtors.  For example, certain of the Critical Vendors are "mom and pop" companies that are so small that the Debtors believe that they would go out of business if they were not paid timely and in full.  The Debtors would not be able to manufacture and sell the storage tanks, aluminum domes, and specialty covers without these Goods and Services.  Failure to procure the Goods and Services provided by the Critical Vendors could thus jeopardize the Debtors' ability to complete ongoing or future projects.  Since the Debtors' revenue source is derived from their sale of the storage tanks, aluminum domes, and specialty covers, the Debtors' inability to continue operations would have a severe impact on the Debtors' cash flow.  It is therefore imperative for the Debtors to pay the Critical Vendors to continue receiving the Goods and Services on an uninterrupted basis.

183.   The Debtors' management team and I estimate that, as of the Petition Date, the total outstanding amount owed to the Critical Vendors is approximately $2.3 million (the "Critical Vendor Claims").

184.   If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Critical Vendors may refuse to continue to deliver Goods or provide Services to the Debtors—Goods and Services essential to the operation of the Debtors' businesses and critical to maintaining the going-concern value of the Debtors' businesses in order to successfully reorganize.

185.   The Debtors submit, and I agree, that payment of the Critical Vendor Claims is necessary to the Debtors' efforts to maintain their operations and thereby maximize the value of their businesses in chapter 11.  If the Critical Vendor Motion is not granted, the Debtors submit, and I agree, that many of the Critical Vendors will refuse to do business with the Debtors.  Such a result would be extremely damaging, if not debilitating, to the Debtors and their estates.

**Debtors' Motion for Entry of Interim and Final Orders Authorizing
(I) the Payment of Certain Prepetition Shipping Obligations and
(II) Granting Related Relief (the "Shipping Services Motion")**

186.    The Debtors respectfully request the entry of an order authorizing, but not directing, the Debtors, in their reasonable business judgment, to (i) to pay certain prepetition claims by Shippers for Shipping Services in an aggregate amount not to exceed $1.2 million (the "Shipping Services Cap"), $500,000 of which the Debtors seek to pay on an interim basis pending a final hearing on this Motion (the "Interim Shipping Services Cap"), and (ii) continue during the postpetition period their prepetition practices with respect to Shippers.  In addition, the Debtors seek an order authorizing and directing all banks and other financial institutions to receive, process, honor and pay any and all checks or wire transfers drawn on the Debtors' accounts with respect to payments described in this Motion.

187.    In the ordinary course of the Debtors' business the Debtors utilize the services of, and make payments to, the Shippers, which include commercial common carriers, movers, shippers, freight forwarders and consolidators, delivery services, and other third-party  service providers which ship, transport, and otherwise facilitate the movement of goods.

188.    The Shipping Services provided by the Shippers are essential to the Debtors' day-to-day operations.  Absent payment on account of the Shipping Services provided to the Debtors, the Shippers may refuse to provide Shipping Services to the Debtors or may assert liens on the goods in the possession of the Shippers.  Furthermore, any disruption to the Shipping Services provided to the Debtors may lead to the violation of contractual obligations to customers, result in financial penalties, or lead to a loss of business from customers.  Such disruptions may harm the going-concern value of the Debtors' businesses.

189.    The Debtors' management team and I estimate that, as of the Petition Date, the total outstanding amount accrued on account of Shipping Services is approximately $1.2 million (the "Shipping Services Claims").

190.    The Debtors believe, and I agree, that payment of the Shipping Services Claims is necessary to the Debtors' efforts to maintain their operations and thereby maximize the value of their businesses in chapter 11.  If the Shipping Services Motion is not granted, the Debtors believe, and I agree, that many of the Shippers will refuse to do business with the Debtors.  Such a result would be extremely damaging, if not debilitating, to the Debtors and their estates.

**Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations Owed to Foreign Vendors; (II) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests; and (III) Granting Related Relief (the "Foreign Vendors Motion")**

191.    The Debtors respectfully request the entry of interim and final orders (i) authorizing, but not requiring, the Debtors to pay all prepetition satisfy, in their reasonable business judgment, in the ordinary course of business, the prepetition obligations owed to Foreign Vendors; and (ii) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing.

192.    The Foreign Vendors provide, among other things, goods and services to the Debtors.  These goods and services are critical in the ordinary course of the Debtors' businesses.  If the Debtors were unable to obtain the goods and services from the Foreign Vendors on a timely basis or on commercially reasonable terms, the Debtors' operations would be severely harmed, diminishing the Debtors' chance of a successful reorganization.

193.    The Debtors are making every effort to avoid interruptions in their operations and the adverse effects that even a temporary break could have on their businesses.  The Debtors

63

submit that it is especially important that they have the flexibility to deal with the Foreign Vendors.  Foreign Vendors may have confused and guarded reactions to the United States bankruptcy process.  They are likely to be unfamiliar or uncomfortable with the unique debtor in possession mechanism that is at the heart of chapter 11.  Based on the reactions of foreign suppliers in other chapter 11 cases, there is a significant risk that the nonpayment of even a single invoice could cause a Foreign Vendor to stop providing goods or services to the Debtors on a timely basis or completely sever its business relationship with the Debtors.  If the Debtors were unable to obtain products and services from the Foreign Vendors on a timely basis or on commercially reasonable terms, the Debtors' operations would be severely harmed, diminishing the Debtors' chance of a successful reorganization.

194.    The Debtors are aware of approximately $118,455 (in USD) of Foreign Vendor claims that are due and payable as of the Petition Date, and an additional $1,330,022 (in USD) of foreign vendor claims that will become due and payable within approximately sixty (60) days of the Petition Date.

195.    By the Foreign Vendors Motion, the Debtors seek authorization to pay the Foreign Vendor Claims in an amount not to exceed $1.5 million (the "Foreign Vendor Cap"), $118,455 of which the Debtors seek to pay on an interim basis pending a final hearing on this Motion (the "Interim Critical Vendor Cap"); and (ii) continue during the postpetition period their prepetition practices with respect to the Foreign Vendors.

196.    If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Foreign Vendors may refuse to continue to deliver goods or provide services to the Debtors—goods and services essential to the operation of the Debtors' businesses and

IMPAC 5242609v.1

critical to maintaining the going-concern value of the Debtors' businesses in order to successfully reorganize and complete the sale process envisioned by the Debtors.

197.    The Debtors believe, and I agree, that payment of the Foreign Vendor Claims is necessary to the Debtors' efforts to maintain their operations and thereby maximize the value of their businesses in chapter 11.  If the Foreign Vendor Motion is not granted, the Debtors believe, and I agree, that many of the Foreign Vendors will refuse to do business with the Debtors.  Such a result would be extremely damaging, if not debilitating, to the Debtors and their estates.

**Debtors' Motion for Entry of an Order Establishing Notification and Hearing Procedures and Approving Restrictions on Certain Transfers of Claims Against and Interests in the Debtors' Estates (the "Equity Trading and Sell Down Motion")**

198.    The Debtors request authority to establish notice and hearing procedures (collectively, the "Procedures") that must be satisfied before  certain transfers of common and/or preferred stock of CST Industries Holdings Inc. or any beneficial interest therein (the "Stock") are deemed effective and establishing notice and sell down procedures for trading in claims against the Debtors' estates (the "Claims").   Specifically, the Debtors seek to establish the Procedures to protect the potential value of the Debtors' net operating loss carryforwards ("NOLs") and certain other tax attributes (together with the NOLs, the "Tax Attributes").  The Procedures would apply with respect to the Stock and would impose restrictions and notifications requirements, to be effective *nunc pro tunc* to the filing of the Equity Trading and Sell Down Motion. Parties would be notified of the Procedures through publication of a notice, which describes the trading restrictions and notification requirements established in the proposed order.

199.    The Debtors have NOLs totaling approximately $22,371,000.  As described in greater detail in the Equity Trading and Sell Down Motion, the Debtors believe that the NOLs

could result in significant tax savings.  However, much of that value will be lost if the Equity Trading and Sell Down Motion is not granted.  Specifically, the Debtors' ability to meet the requirements of the tax laws to protect their tax attributes may be seriously jeopardized, unless procedures are established to ensure that certain trading in Stock is either precluded or closely monitored and made subject to Court approval.  The Debtors therefore believe, and I agree, that the proposed Procedures and restrictions are necessary to protect the value of the Debtors' Tax Attributes, which are valuable assets of the Debtors' estates, while providing appropriate latitude for trading in Stock and Claims below specified levels.  The Debtors' ability to meet the requirements of the tax laws to protect their tax attributes may be seriously jeopardized unless procedures are established to ensure that certain trading in Stock and Claims are either precluded or closely monitored and made subject to Court approval.

200.    The relief requested in the Equity Trading and Sell Down Motion is narrowly tailored to permit certain trading to continue.  By the Equity Trading and Sell Down Motion, the Debtors are seeking only to enforce the provisions of the injunction sought in connection with certain transfers or conversion of Stock or Claims that pose a serious risk under the ownership change tests.

201.    For the reasons discussed herein and in the Equity Trading and Sell Down Motion, the Debtors respectfully submit, and I agree, that the relief requested therein is in the best interests of the Debtors, their estates and creditors, and therefore should be granted.

**Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy
Solutions, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c),
11 U.S.C. § 105(a), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f)
(the "Claims Agent Application")**

202.    The Debtors request, pursuant to 28 U.S.C. § 156(c), section 503(b) of the Bankruptcy Code, Bankruptcy Rule 2002(f), and Local Rule 2002-1(f) the entry of an order

66

appointing Epiq Bankruptcy Solutions, LLC ("Epiq") as Claims and Noticing Agent for the Clerk's Office to, among other things (a) serve as the Court's noticing agent to mail notices to the estates' creditors and parties in interest, (b) provide computerized claims database services, (c) provide and maintain the Debtors' case management website, and (d) provide expertise, consultation and assistance in claim processing and other administrative information.

203.    Based on Epiq's considerable experience in providing similar services in large chapter 11 cases, the Debtors believe, and I agree, that Epiq is eminently qualified to serve as Claims and Noticing Agent in these Chapter 11 Cases.  A detailed description of the services that Epiq has agreed to render and the compensation and other terms of the engagement are provided in the Claims Agent Application, the Tran Declaration and the engagement letter between the Debtors and Epiq.  I have reviewed the terms of the engagement and believe that the Debtors' estates, their creditors, parties-in-interest and this Court will benefit as a result of Epiq's experience and cost-effective methods.  Accordingly, the Claims Agent Application should be approved.

## Conclusion

For the foregoing reasons, I respectfully submit that the relief requested in the First Day Motions is appropriate inasmuch as such relief will assist the Debtors in maximizing the value of their assets with the least possible disruption or harm to their business.  Based on the foregoing, I believe that the relief requested in the First Day Motions is necessary and appropriate, is in the best interests of the Debtors' estates and their creditors and should be granted in all respects.

*[Remainder of Page Intentionally Left Blank]*

67

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on June 9, 2017.

*/s/ Timothy J. Carpenter*
Timothy J. Carpenter
*Chief Executive Officer of CST Industries Holdings Inc. and CST Industries, Inc.*

68